STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, ss.                                    Docket No. RE-17-97


STEVEN KELLEY                          )
                 Plaintiff,            )
                                       )
                                       )
        v.                             )              **Judgment**
                                       )
                                       )
KATHRYN RICHARDSON                     )
                 Defendant.            )


This matter came before the court for trial on June 4, 5, and 6, 2019. Plaintiff appeared with his attorney, Scott Lynch. Defendant appeared with her attorney, Ezra Willey.

The Plaintiff filed his 4-count complaint on October 18, 2017. Defendant filed her 11-count counterclaim on November 14, 2017, and an amended counterclaim on January 11, 2018.

General Factual Background
The parties became involved in a romantic relationship shortly after they met in South Carolina. They then decided to move to Maine together, the place where the Plaintiff grew up and where his children were located. Defendant owned a home in South Carolina, and before moving to Maine, the parties readied that home to be rented.

Upon the parties move to Maine in early 2010, they lived with the Plaintiff's twin brother and his fiancée for a few months. Thereafter, together they moved into 738 N. Main Street in Brewer, Maine under what they believed was a rent-to-own situation. While the arrangement did not turn out to be a rent-to-own situation, the parties purchased 738 N. Main Street in Brewer, Maine in June of 2011. They are joint tenants on the deed.

The parties continued to co-habit at 738 N. Main Street in Brewer, Maine until April of 2015. Both parties worked hard and shared household expenses. Defendant handled the finances for the couple. Defendant was careful with money and the bills were paid on time. Defendant had an excellent credit score. In 2011-2012, Plaintiff went through bankruptcy.

After purchase of the home, the parties made many improvements to it. Most importantly, the roof was completely replaced. Additionally, new windows were installed, the interior walls were refinished, new hardwood floors were installed, and new tile was installed. The parties also removed the asbestos siding and replaced it with boards. These boards were painted with a product which was designed to delay the need to put permanent exterior materials (siding) on the house. Plaintiff did a great deal of the work himself, Defendant contributed to some of the work, and the parties hired others to help with the work. The materials for the improvements were paid

1

in a general way through the earnings of both parties. While some of the work may need to be re-done, these improvements were made.

Plaintiff was a floor installer by trade and Defendant was a waitress. They both had success in their jobs. In fact, Plaintiff was so successful in his work that after working for another company, he struck out on his own and did business as "Kelley Flooring." After a couple of years, his work had increased to such a degree that he needed help with the administrative aspects of the business. Defendant stepped into this role, and demonstrated skill with the administration.

Apparently, "Kelley Flooring" did not keep traditional books, such as a ledger of income and expenses (Accounts/Payable and Accounts/Receivable). This failure to keep traditional books has made it more difficult for the parties to recreate their history and makes it more difficult for the Court to be as precise as it might like. The Court cannot emphasize enough the difficulties this case presents with the commingling of the monies earned by each party, the personal expenses paid from a variety of accounts, the business expenses paid from a variety of accounts, and the general lack of an organized bookkeeping system. It appears that neither party drew a paycheck or wages from "Kelley Flooring," nor were there identified distributions from the business. Finally, the ownership of "Kelley Flooring" changing over the period of time in question further complicates the analysis.

The parties wished to develop the "Kelley Flooring" business. In particular, they hoped to open a "storefront" which would be a show room for floor coverings. In connection with this effort, on September 19, 2013, Plaintiff sold "Kelley Flooring" to the Defendant for $1.00. Kelley Flooring rented a building at 46 Center Street in Brewer, Maine, and began to make leasehold improvements. The first floor, which was intended to be used for the Kelley Flooring store, was gutted. Before December 31, 2013, $8,000 to $10,000 was spent to improve the building on Center Street to create the "Kelley Flooring" showroom.

At some point, the parties learned the Center Street building was in foreclosure, and plans were made to purchase the building. While purchasing the building was, at least in part, an attempt not to lose the value of the leasehold improvements, because of his poor credit, Mr. Kelley could not take advantage of this opportunity. On December 31, 2013, Defendant became the record owner of the Center Street real estate. In connection with the purchase, Plaintiff became a "guarantor" of the loan and he provided his interest in the N. Main Street home as surety for the loan.

The first floor of the Center Street building was never finished and "Kelley Flooring" never created the show room. It does not appear that any substantial money was spent in renovating or upkeeping the Center Street property between December 31, 2013 and April 2015.

There are three apartments at the Center Street location, two on the 2nd floor and one on the third floor. It appears that at least the two apartments on the 2nd floor have generally been rented. In 2015, the rents were sufficient to cover the payment of the mortgage, insurance, and taxes. However, in 2014, 2016, and 2017 the rents have not been sufficient to cover the mortgage, insurance, and taxes.

On April 14, 2014, the parties signed a Partnership Agreement. The Agreement was drafted by the Defendant, after finding an example on-line. The Partnership Agreement was to be known as "Kelley Flooring". There appears to have been no change in the operation of Kelley Flooring

2

from when Defendant began keeping the books through the time the Plaintiff left the relationship in April of 2015. Thus, before the business was sold by the Plaintiff to the Defendant on September 19, 2013, between September 19, 2013 and April 14, 2014 when the Partnership Agreement was signed, and between April 14, 2014 and April of 2015, things remained the same: Plaintiff continued to do installation work along with his crews and Defendant continued to perform the administrative work.

In late March, 2015, Plaintiff was admitted to a short-term substance abuse rehabilitation program[1]. In early April, 2015, the romantic relationship ended when Plaintiff left the N. Main Street home. Between April, 2015 and June, 2015, "Kelley Flooring" operated in a confusing manner. Plaintiff did some installations and Defendant did some administrative work, but it was not coordinated. "Kelley Flooring" effectively ended on June 25, 2015.

On March 16, 2016, Mr. Kelley filed a Complaint for Recovery of Personal Property. On April 14, 2016, Ms. Richardson filed a Complaint from Protection from Abuse. Ultimately these cases were resolved through the issuance of a Protection from Abuse Order by agreement and without findings, but with an order that certain personal property of Mr. Kelley be given to him and that other personal property of Mr. Kelley would remain with Ms. Richardson "for the time being." The Complaint for Return of Personal Property was dismissed in connection with the Amended PFA Order.

Eric Clifford and Timothy Kelley picked up some of Plaintiff's personal property from the Defendant, but they did not retrieve the larger items. In April, 2016, Defendant filed a document with the Court stating that she had made Mr. Kelley's personal property available for pick-up, but that Mr. Kelley's agents only retrieved a few personal items.

**Analysis**

The Court will analyze each claim in turn.

Complaint Count I – Partition

    A. 738 N. Main Street – this property is owned by the parties jointly, and the parties agree the property should be sold. Therefore, it is ordered that the property be sold in a commercially reasonable manner. The parties, through their attorneys, shall agree upon a broker to list the property. If the parties cannot agree, Mike Rair, Esq., if he is willing, shall select a broker. The parties shall follow the advice of that broker as to listing price, any price reductions, and the selling price.

    The parties do not agree about the distribution of the proceeds. The main disputes relate to: (i) the down payment, (ii) each party's contributions to the house, and (iii)

---

[1] The Court took the admission of Defendant's Exhibit #65 under advisement, and has decided to admit the exhibit. Plaintiff shared this medical record with the Defendant, and Plaintiff left it behind when he left the parties' residence.

3

Defendant's payment of the mortgage, taxes, insurance, and utilities for the home after Plaintiff's departure in April of 2015.

(i) One party's funds used for the down payment for the home is not a proper item to be considered in this partition. *See Libby v. Lorraine*, 430 A.2d 37 (Me. 1981); *Boulette v. Boulette*, 627 A.2d 1017, 1018 (Me. 1993) ("Contributions of the parties to the property prior to the joint tenancy, however, are not equities growing out of the joint tenancy relationship. To allow the consideration of contributions preceding the joint tenancy would defeat joint ownership.");

(ii) The Court finds that Plaintiff contributed more of the labor than did the Defendant in the improvements made to the home. In particular, Plaintiff replaced the roof, fixed interior walls, installed windows, installed flooring, and worked on the exterior walls. Defendant contributed to some of this work, but her labor was far less than the Plaintiff's;

(iii) During the relationship, both parties contributed to the expenses related to 738 N. Main Street on a basis that satisfied them both at the time; and

(iv) The Court finds that the Defendant has kept the mortgage, taxes, insurance, and utilities paid for the home since Plaintiff's departure and has spent some minor amount of money on improvements. On the other hand, Defendant has had exclusive use and possession of the home since that time. Additionally, Defendant has shared the residence with a third-party for close to the last two years, and this third-party has contributed to the household expenses.

After considering the factors above and balancing all the equities, the Court orders that upon sale of 738 N. Main Street, after payment of the mortgage and costs of the sale, the proceeds will be divided equally by the parties.

Between now and the sale, Defendant shall continue to have exclusive possession of the home and shall keep the regular mortgage payments, insurance, taxes and utilities paid.

B. Center Street

The Center Street property presents the most difficult issue in this case.

Plaintiff claims that he has an ownership interest in the Center Street property, and Defendant claims that she is the sole owner of the Center Street property. Plaintiff claims he made substantial improvements to the property, and that the April 14, 2014 Partnership Agreement was an attempt to memorialize the partnership's acquisition of the building.

Plaintiff has suggested, among other things, that his being a "guarantor" and putting his ½ interest in the N. Main Street home at risk to secure the mortgage on the Center Street property, that his contribution of labor to renovations, that his agreement that Defendant's son should be re-paid for the down payment he loaned for the purchase

4

of the building, and Defendant's taking a photograph of Plaintiff putting a key in the door of the building are all factors the Court should consider in determining that he has an ownership interest in the property.

The Court finds that the purpose of looking into the Center Street property was to find a showroom for "Kelley Flooring." All of the above considerations suggested by the Plaintiff are consistent with Plaintiff wishing to do what he could, particularly given his poor credit, to make the showroom a reality. Even the photograph is consistent with Plaintiff being proud to be advancing the "Kelley Flooring" business, a business that still contained his name (even though he no longer owned it).

On December 31, 2013 when the building was purchased, title to the property was taken by Kathryn Richardson, and remains in that form. Importantly, title is not in the name of "Kelley Flooring", or even Kathryn Richardson, d/b/a "Kelley Flooring."

On April 14, 2014, the date of the Partnership Agreement, "Kelley Flooring" did not have a store at the Center Street property and the storefront was far from complete. The Partnership Agreement itself listed the "Kelley Flooring" business address as 738 N. Main Street in Brewer, Maine.

Finally, during his testimony when asked about his concern that the Center Street property was not in his name, Mr. Kelley stated, among other things that "I wanted it **back**.[2]" This suggests Mr. Kelley wanted back what he owned in September of 2013 when he sold Kelley Flooring to Ms. Richardson. When Mr. Kelley sold his interest in "Kelley Flooring" in September of 2013, the Center Street building was not owned by "Kelley Flooring" or Mr. Kelley (or Ms. Richardson).

On the other hand, a careful review of Ms. Richardson's tax returns reflects that the "Kelley Flooring" business was reported on her Schedule C for years 2013 through 2015. The Center Street property was reported on Schedule E, beginning in 2014. The 2014 and 2015 Schedule C's for "Kelley Flooring" show that ½ of the mortgage, ½ of the taxes, ½ of the insurance and perhaps some utility payments for the Center Street property were listed as expenses for "Kelley Flooring.[3]" The Court has carefully considered whether this tax return information accurately evidences ownership by "Kelley Flooring" of the Center Street real estate, and has concluded that it does not. Simply by reporting something on a tax return does not make it so.

---

[2] Kelley: "I signed over the company and all of this. But with the company and everything, I wanted it back. You know, because things were going sour and I asked several times to give it back. Let's just go to the bank and she said no."

[3] The Court made this determination by comparing the Schedules to Ms. Richardson's 2014, 2015, and 2016 tax returns. Beginning in 2016, Ms. Richardson no longer included a schedule for "Kelley Flooring" and the expenses on the Schedule E for the Center Street property approximately doubled. For example, the mortgage expense for "Kelley Flooring" in 2014 was $3,404.00, and the mortgage expense for Center Street on the Schedule E was $3,404.00. In 2016, when "Kelley Flooring" was no longer part of Ms. Richardson's tax return, the mortgage expense for the Center Street property was listed as $6,421.00

The Court does not find that Mr. Kelley made substantial improvements to the Center Street property in reliance on a promise that the property would be conveyed to him: the substantial improvements were made before the Defendant owned the Center Street property and the court does not find that Defendant promised to convey any interest in the Center Street property to the Plaintiff or that Plaintiff performed any work on the property in reliance on any such promise. *See Tozier v. Tozier*, 437 A. 2d 645 (Me. 1981) (promisee made substantial improvements to land in reliance on promise that the land would be conveyed to him). The Court does not find that, by her actions, Ms. Richardson impliedly promised to convey the Center Street property to Mr. Kelley. And, despite other evidence, while the Court finds that the April 14, 2014 Partnership Agreement conveyed 49% of the interest of "Kelley Flooring" to the Plaintiff, the Court is not satisfied that "Kelley Flooring" owned the Center Street property or that the Partnership Agreement conveyed or intended to convey the Center Street property to the Partnership (or to Mr. Kelley).

Plaintiff has the burden to establish an ownership interest in the Center Street property, and the Court finds that he has not met his burden. Therefore, the Center Street property is not subject to partition.

## Count II – the Breach of Contract
This claim was withdrawn by the Plaintiff.

## Count III – Unjust Enrichment

In his Complaint, Plaintiff alleged: "[d]uring the period of the parties' cohabitation, Plaintiff made payments, incurred expenses and spent monies in furthererance of the parties' joint enterprise/businesses as detailed above, from which Defendant knowingly benefited to the detriment of the Plaintiff, with respect to which Defendant has failed or refused to repay or to confer any return benefit to Plaintiff despite due demand therefor, as to which the Defendant's retention of such benefits would be inequitable and unjust."

A claim for unjust enrichment requires that the plaintiff establish: (a) that he conferred a benefit on the defendant; (b) that the defendant had appreciation or knowledge of the benefit; and (c) the defendant accepted or retained the benefit under circumstances that make it inequitable for the defendant to retain the benefit without payment of its value *Maine Eye Car Assoc. v. Gorman*, 2008 ME 36, ¶17, 942 A.2d 707.

Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Aladdin Elec. Assoc. v. Town of OOB*, 645 A.2d 1142, 1145 (Me. 1994).

During the parties' relationship, the bulk of the funds to improve the Center Street property were spent in the fall of 2013, before Defendant acquired the Center Street property and at a time when Defendant owned 100% of "Kelley Flooring." The materials for renovations were primarily purchased with a Lowe's credit card. Ms.

6

Richardson's son paid the credit card balance to enable his mother to secure a loan for the Center Street property (and Ms. Richardson owes her son $30,000 for his efforts to help her be in a position to purchase the building). Because the materials were primarily paid in this way, and Ms. Richardson owes the money to her son, the Court does not find that Mr. Kelley personally contributed in any significant way to the purchase of the materials.

The labor for the work to create a showroom for "Kelley Flooring" was performed by "Kelley Flooring" workers, including the Plaintiff. Yet, Mr. Kelley was working for "Kelley Flooring" and at the time "Kelley Flooring was owned 100% by Ms. Richardson. Thus, Mr. Kelley's work on the building was part of his "contractual relationship" with "Kelley Flooring."

However, the Court is satisfied that Mr. Kelley's work for "Kelley Flooring" generated income for the Kelley-Richardson household and that income, along with Ms. Richardson's wages[4], was used to pay all the bills (personal and business-related). Sometimes the rents collected for the Center Street property were sufficient to cover the expenses for Center Street and sometimes they were not. Given the insufficiency of the rental income, the Court finds that Mr. Kelley directly or indirectly contributed toward payments (mortgage, tax, insurance, and utility payments) on the Center Street property. Thus, the Court finds it equitable that Ms. Richardson pay Mr. Kelley $6,000.00 on this unjust enrichment claim.

Judgment is entered for Mr. Kelley in the amount of $6,000.00 on Count III of the Complaint.

## Count IV – Return of Personal Property

The District Court has exclusive jurisdiction over an action to recover personal property. See 14 M.R.S. § 7071. This case was filed in the Superior Court. Thus, this Court has no jurisdiction over this claim at this time. The attorneys may arrange for Ms. Richardson's agreement to turn over the property to Mr. Kelley to be effectuated.

Judgment is entered for Ms. Richardson on Count IV of the Complaint.

## Counterclaim Count I – Promissory Estoppel

The Law Court has adopted the definition of promissory estoppel as set forth in the Restatement (Second) of Contracts § 90 (1981):

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

---

[4] During 2014, Ms. Richardson earned $34,934.00 gross from the Coach House Restaurant. These funds were also contributed to the Kelley-Richardson household.

7

*Bracale v. Gibbs,* 2007 ME 7, ¶ 14, 914 A.2d 1112 (quoting Restatement (Second) of Contracts § 90); *see also Chapman v. Bomann,* 381 A.2d 1123, 1127 (Me. 1978) (adopting § 90 of the Restatement (Second) as the law of Maine). A "promise" is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Harvey v. Dow,* 2008 ME 192, ¶ 18, 962 A.2d 322 (quoting Restatement (Second) of Contracts § 2(1)).

In her Counterclaim, Ms. Richardson alleged that Mr. Kelley promised: "repayment of funds improperly taken from the parties' business, as well as repayment of debts and lost profits incurred as a result of his addiction fueled actions." Ms. Richardson also testified that when he left, Mr. Kelley promised to pay his ½ of the debt. Finally, Ms. Richardson testified that Mr. Kelley promised to repay her for loans she made to him to buy a van (in 2010), for legal fees for his divorce and bankruptcy, and moving costs.

Taking the last claims first, these claims were not alleged in count I of the counterclaim. The van, legal fees, and moving costs are not related to "funds improperly taken from the parties' business." For that reason alone, the Court would not make an award based on these items. Moreover, Ms. Richardson has not established that Mr. Kelley made any promises to repay Ms. Richardson for the van, moving costs[5], or legal fees. Unlike other agreements between the parties, no writings memorialize these alleged promises. Moreover, at the times these expenses were incurred, the parties were living together and were attempting to build a life together. Given that Mr. Kelley owned "Kelley Flooring" at the time the legal fees were incurred, the Court finds that the proceeds from "Kelley Flooring" contributed toward these payments – either directly or indirectly.

While Mr. Kelley may have made some promises to repay funds to the business, including the Credit Union loan, the Court is not satisfied that Ms. Richardson has established that any such promise induced any action or forbearance on her part. Ms. Richardson did not articulate any action or forbearance on her part. To recover under a theory of promissory estoppel not only must the promises be established, but the party seeking relief must also establish her reliance on the promises to her detriment. To the extent any promises to repay were made at the end of the relationship, the opportunity for action or forbearance on the part of Ms. Richardson had passed. The promises are uncertain, the inducement of action or forbearance is uncertain; and even if the first two elements were proven, Ms. Richardson has not met her burden of proof regarding damages[6].

Finally, with respect to Mr. Kelley's late March 2015 agreement to work with Ms. Richardson in the business, Ms. Richardson has not established any action or forbearance on her part. While Ms. Richardson continued to try to make a "go" of the business, it was not possible once the personal relationship between Ms. Richardson and Mr. Kelley ended.

Therefore, Judgment is entered for Mr. Kelley on Count I of the Counterclaim.

---

[5] As an aside, it appears that Mr. Kelley moved very little from South Carolina to Maine.

[6] The Court is not satisfied that Ms. Richardson has proven by a preponderance of the evidence that Mr. Kelley spent $ 32,000.00 (Plaintiff's estimate) from "Kelley Flooring" on illegal drugs. There is no forensic accounting and the Court just does not find the estimate sufficiently reliable to base a judgment on it.

8

## Counterclaim Count II – Negligent Infliction of Emotional Distress

In her Counterclaim, Ms. Richardson alleged, among other things, that Mr. Kelley "negligently acted against Plaintiff, … and failed to use the standard of care that a business partner should have followed under those circumstances…" The Counterclaim continues: "Defendant violated the appropriate standards of care when dealing and interacting with, his domestic partner, Plaintiff…"

With respect to the NIED claim, the plaintiff must establish that:

1) the defendant(s) owed a duty to the plaintiff;
2) the defendant(s) breached that duty;
3) the plaintiff was harmed (severe emotional distress); and
4) the breach caused the plaintiff's harm.

*Curtis v. Porter*, 2001 ME 158, ¶¶ 18-20, 784 A.2d 18. In *Curtis*, the court noted that plaintiffs face significant hurdles in establishing the requisite duty, "in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability. Although each person has a duty to act reasonably to avoid causing physical harm to others, there is no analogous general duty to avoid negligently causing emotional harm to others." *Id.*

The Law Court has recognized a duty to avoid causing others emotional harm only in "very limited circumstances" where either there is a bystander liability claim, or "in circumstances in which a special relationship exists between the actor and the person emotionally harmed." *Curtis*, 2001 ME 158, ¶¶ 19, 784 A.2d 18 (a NIED claim may also lie where the actor has committed another tort, but the NIED claim based on another tort is subsumed within the other tort).

Plaintiff has not provided the Court with any citation for the proposition that "domestic partners" or "business partners" have the type of special relationship that would impose a duty on one to avoid emotional harm to the other. Moreover, this Court has not found any Maine case supporting the proposition that "domestic partners" or "business partners" owe a tort duty to the other "domestic partner" or "business partner" to avoid emotional harm.[7]

---

[7] The only types of relationships that the Law Court has found to satisfy the duty element of NIED are: a physician-patient relationship; a hospital's relationship to the family of a deceased; a psychotherapist-patient relationship; and a relationship between a custodial parent and her child. *See Bryan v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 31, 738 A.2d 839; *Steadman v. Pagels*, 2015 ME 122, ¶ 27, 125 A.3d 713. The Law Court has declined to recognize a "special relationship" for purposes of NIED in the following circumstances: the relationship between churches and its members; the fiduciary relationship of a foreclosing mortgagee, personal representative, or sole owner of real estate; and the relationship between a customer and pizza delivery person. *See Watchtower Bible*, 1999 ME 144, ¶ 31, 738 A.2d 839; *Oceanic Inn, Inc. v. Sloan's Cove*, 2016 ME 34, ¶ 24, 133 A.3d 1021; *Curtis*, 2001 ME 158, ¶ 21, 784 A.2d 18.

The Court enters Judgment for Mr. Kelley on Count II of the Counterclaim.

Counterclaim Count III – Fraud

This Count was withdrawn by the Defendant/Counterclaim Plaintiff.

Counterclaim Count IV – Fraudulent Misrepresentation

This Count withdrawn by the Defendant/Counterclaim Plaintiff.

Counterclaim Count V – Unjust Enrichment

In her Counterclaim, Ms. Richardson alleged that: "[D]efendant, through his actions, encouraged Plaintiff to take certain actions and provide certain monies, that benefitted the Defendant through increased income to him, but decease in funds for the operation of the business, including lost profits and incurring debts; Plaintiff relied on the promises of the Defendant." The Counterclaim continues: "The Defendant took certain tools and equipment of the business as well as personal tools of the Plaintiff, without permission…"

As noted above, a claim for unjust enrichment requires that the plaintiff establish: (a) that she conferred a benefit on the defendant; (b) that the defendant had appreciation or knowledge of the benefit; and (c) the defendant accepted or retained the benefit under circumstances that make it inequitable for the defendant to retain the benefit without payment of its value. *Maine Eye Car Assoc. v. Gorman*, 2008 ME 36. Further unjust enrichment is a theory of recovery only when there is no contract or quasi-contractual relationship. *Aladdin Elec. Assoc. v. Town of OOB*, 1994 Me Lexis 172.

One of Ms. Richardson's arguments that runs through many of the counts of the Counterclaim is that Mr. Kelley used money from "Kelley Flooring" to buy illegal drugs. The Court accepts Ms. Richardson's testimony that Mr. Kelley struggled with a substance abuse issue. The Court finds that the substance abuse issue became progressively worse over time. The Court further accepts Ms. Richardson's testimony that Mr. Kelley's substance abuse issues kept him from contributing the same amount of labor and expertise to the "Kelley Flooring" business toward the end of the relationship that he had earlier. Mr. Kelley's contributions may also have decreased due to physical issues (back and knee), which appear to have contributed to the substance abuse issues. However, given Sonny Shaw's testimony and the gross income of "Kelley Flooring" in 2015[8], the Court does not accept Ms. Richardson's testimony with respect to the extent of the impact that substances had on Mr. Kelley's work or the length of time over which the impact occurred.

While the Court is satisfied that Mr. Kelley may have used some money generated by "Kelley Flooring" (which appears to have been his only source of funds for personal

---

[8] The Court's review of the tax records indicates gross receipts of $142,880 for the 12 months of 2014 ($11,905/month) and gross receipts of $78,284 for the first 4 months of 2015 ($19,571/month). While this is only the Court's review, unassisted by a forensic expert, there does not appear to be a drop in the work being done/proceeds being brought in. Additionally, the wages in 2014 were $43,344 and line 37 was $$7,000. The wages in 2015 were $2878 and line 37 was 0.

10

expenses) for substances, this finding does not establish a claim for unjust enrichment with respect to the business funds or tools. Unjust enrichment is a claim where there is no contractual or quasi-contractual relationship. *Paffhausen v. Balano*, 1998 ME 47, ¶ 6. With respect to the decrease in business funds or the taking of business tools, the Court does not find that Ms. Richardson "conferred" a benefit on Mr. Kelley outside the contractual relationship.

With respect to her personal tools, even if it could be said that Ms. Richardson "conferred" a benefit on Mr. Kelley when Mr. Kelley took Ms. Richardson's personal tools, damages must be based on the "value of what was inequitably retained." *Id.* ¶ 7. Ms. Richardson claimed that the "replacement value" of the personal tools was $945.50. While damages need not be proven to a mathematical certainty, neither may they be based on guesswork or speculation. *Morissette v. Somes*, 2001 ME 152 ¶ 11, *Carter v. Williams*, 2002 ME 50 ¶¶ 9-11. There is no evidence in the record of the "value" of the "inequitably retained" tools, and thus Ms. Richardson has not met her burden of proof on this claim.

Thus, Court enters Judgment for Mr. Kelley on Count V of the Counterclaim.

## Counterclaim Count VI- Negligent Interference with Contractual Obligation

In her Counterclaim, Ms. Richardson alleged that: "[d]ue to the Defendant's actions, Plaintiff was required to close the business and dissolve the partnership, which resulted in lost profits, loss of good will, as well as business expansion and growth."

To establish a case for tortious interference with existing and prospective advantageous economic relations ("tortious interference"), the plaintiff must show:

1. that a valid contract or prospective economic advantage existed;
2. that defendant interfered with that contract or advantage through fraud or intimidation; and
3. that such interference proximately caused damages.

*Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400.

During closing argument, Ms. Richardson argued that this count related to the taking of business tools. The Court is not satisfied that the taking of tools constitutes the negligent interference with a contractual obligation. Moreover, while Ms. Richardson has established that "Kelley Flooring" had contracts with various entities, she has not established that Mr. Kelley interfered with such contract(s) through fraud or intimidation. At best, Mr. Kelley simply ceased working for "Kelley Flooring" and the business could not continue without him. The Court enters Judgment for Mr. Kelley on this count.

## Counterclaim Count VII – Negligence

In this Count of her Counterclaim, Ms. Richardson alleged that "Defendant negligently violated the standards of care in his duties, obligations and conduct to Plaintiff, as a business partner and or domestic partner."

11

The first element of a negligence claim is the existence of a duty. There is no recognized tort duty under Maine law to treat a "domestic partner" in any particular way. While those in a personal relationship with another may maintain an action of assault and battery or another tort, there is no general cause of action for negligence. Nor, is there any recognized tort duty under Maine law to treat a business partner in a particular way. Remedies between business partners are rooted in contract law. Thus, Court enters Judgment for Mr. Kelley on this count.

Counterclaim Count VIII – Conversion

In her Counterclaim, Ms. Richardson alleged that: "Defendant enticed and induced Plaintiff to give him funds from the business which he knew he had no legal right or interest in, and made those funds his own." The Counterclaim continued: "Defendant took certain tools and, or other equipment belonging to the business, as well as taking personal tools and, or equipment from the Plaintiff."

The Law Court has explained:

> To establish a claim for conversion, the plaintiff must show an invasion of the plaintiff's possession or right to possession by demonstrating "(1) a property interest in the goods; (2) the right to their possession at the time of the alleged conversion; and (3) when the holder has acquired possession rightfully, a demand by the person entitled to possession and a refusal by the holder to surrender.

*Mitchell v. Allstate Ins. Co.,* 2011 ME 133. *See also Withers v. Hackett* 1998 ME 164 (as to the third element, a plaintiff may alternatively establish that, under the circumstances, a demand would have been useless.)

Before September 2013, Plaintiff was 100% owner of "Kelley Flooring." On September 19, 2013, Defendant became the 100% owner of "Kelley Flooring." On April 14, 2014, Plaintiff became a 49% owner of "Kelley Flooring" and Defendant became a 51% owner of "Kelley Flooring."

Ms. Richardson alleges that Mr. Kelley took money from the business to support a drug habit, that he took business tools in connection with the parties April 2015 breakup, and that he took her personal tools.

With respect to money taken by Mr. Kelley from "Kelley Flooring," the Court is satisfied that Mr. Kelley took some money from "Kelley Flooring" to support his habit. This finding, of course, is complicated by the fact "Kelley Flooring" was Plaintiff's sole source of funds for personal expenses, and was treated as such by the parties. Ms. Richardson estimated that the amount of money taken was $32,000.00 to support his substance abuse issue. The Court simply is not satisfied with the reliability of this estimate. The Court does not accept the method by which Ms. Richardson came to this estimate. Ms. Richardson did not present any persuasive testimony to support her estimate, nor did she present any forensic analysis. Mr. Kelley and his crew(s) traveled

12

for work, and the business was run rather loosely. The Court will not speculate on the amount of money taken from the business for this purpose.

The Court is satisfied that on one occasion Mr. Kelley took money from the business that was designated to cover payroll. He then was able to take a personal loan to cover this amount. The principal amount of the loan increased over time, but this is a debt of the Defendant for which he is/was responsible. The parties' paid the payments on this University Credit Union loan for some period of time, but the amount of the payments and the period of time over which the parties' made the payments as part of their joint expenses is unknown.

The Court is satisfied that Mr. Kelley kept some business tools owned by "Kelley Flooring" when he left Ms. Richardson in April of 2015. Ms. Richardson estimated that Mr. Kelley kept $25,000.00 in business tools. The Court is not satisfied with the reliability of this estimate, nor is it known whether this figure is based on fair market value in 2015 or replacement value. Among other things, the Court has reflected on the Schedule Cs with respect to "Kelley Flooring" tools when "Kelley Flooring" was reported on Ms. Richardson's tax returns. (Moreover, while not directly on point to 2015, it should be noted that in 2010, Mr. Kelley was depreciating tools that had been purchased as far back as 1996.) It is also unclear if Ms. Richardson made the requisite demand for a conversion claim. The Court does not find that Ms. Richardson has proven the damages element of her claim.

The Court is satisfied that Mr. Kelley took some of Ms. Richardson's personal tools when he left the relationship. Ms. Richardson claimed that the "replacement value" of the personal tools was $945.50. However, the proper measure of damages in a conversion action is the value of the property at the time of conversion. See *Doughty v. Sullivan*, 1995 Me. Lexis 147. There is no evidence of the "value" of the tools when taken. It is also unclear if Ms. Richardson made the requisite demand. Thus, Ms. Richardson has not met her burden of proof on this claim.

Mr. Kelley continued to install flooring after the parties' breakup in April of 2015. It appears that at least some of this work was in connection with "Kelley Flooring," then owned 51% by Ms. Richardson and 49% by Mr. Kelley. It appears that most of the income from these jobs was paid to "Kelley Flooring," and the payments were received by Ms. Richardson. Ms. Richardson then paid the crews and paid for certain of Mr. Kelley's expenses. The evidence suggests that Ms. Richardson received the payments for the work done by "Kelley Flooring" and she distributed the money as she saw fit. The parties seemed to operate in a dysfunctional way during the wind-up of the partnership, but to the credit of Ms. Richardson, the business did wind-up. The Court does not find acts of invasion of Ms. Richardson's property rights by Mr. Kelley upon cessation of the parties' personal relationship or the requisite notice for a conversion claim.

Thus, the Court enters Judgment for Mr. Kelley on Count VIII of the Counterclaim.

13

<u>Counterclaim Counts IX and X– Breach of Fiduciary Duty and Breach of Contract</u>

In Count IX, Ms. Richardson alleged that "Defendant owed Plaintiff certain fiduciary duties ...." In Count X of the Counterclaims, Mr. Richardson alleged that: "Plaintiff and Defendant had entered into a contract named the "Partnership Agreement" to which each party owed the other certain obligations, and which required each party to comply with the terms set forth in the Agreement, including, but not limited to, performing according to the roles set forth for each[9]." The Court does not discern any meaningful difference in in Counts IX and X in this case.

Maine law provides that a partner owes the partnership and the other partners a limited duty of loyalty and of due care as set forth in 31 M.R.S. § 1044. The Partnership Agreement in this case does not clarify or limit the duties in any meaningful way, other than specifying that Mr. Kelley's responsibility was "for all installation and contractual decisions" and Ms. Richardson's responsibility was "for the office and finacial (sic) part of the business."

To prevail on a breach of contract claim, the plaintiff must prove: (1) a breach of a material contract term, (2) causation, and (3) damages. *Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248. The contract in question is the Partnership Agreement.

As noted above, the Court is satisfied that Mr. Kelley's substance abuse issue interfered to some extent with his work for "Kelley Flooring" for the first few months of 2015. However, given the testimony of Sonny Shaw and the gross receipts for the business, the Court is not satisfied that the business suffered as greatly as Ms. Richardson testified. Again, as noted above, the Court is further satisfied that Mr. Kelley spent some money generated by "Kelley Flooring" to purchase drugs.

Thus, the Court is satisfied that Mr. Kelley breached the Partnership Agreement and breached his fiduciary duties to the Partnership; however, again, the Court is not satisfied that Ms. Richardson has established damages. As noted in connection with the count for conversion, the Court does not accept Ms. Richardson's $32,000 estimate for the amount of money taken by Mr. Kelley from the Partnership in connection with his substance abuse issues. Additionally, the Court cannot determine from the evidence presented the number of jobs that were affected by Mr. Kelley's substance abuse issues, the dollar amount of the jobs that were affected, or the dollar value of the jobs that "Kelley Flooring" may not have received due to Mr. Kelley's acts. Moreover, the parties seemed to treat "Kelley Flooring" as an extension of themselves and used the partnership funds and Ms. Richardson's wages to meet their needs, wants, and obligations. It does not appear that either party respected the partnership structure. While Mr. Kelley had a period of time where he contributed less to "Kelley Flooring" then he had before that time, there was no reliable quantification of that reduction. As to the last several weeks of the partnership which began in essence on the day the parties' personal relationship terminated, without Mr. Kelley's labor, "Kelley Flooring" was not a viable entity. While Mr. Kelley (nor Ms. Richardson) dissolved the partnership as required by the Partnership

---

[9] The breach of contract claim does not allege any breach of any alleged promises to repay personal debts.

Agreement, Mr. Kelley was entitled to stop working for the Partnership, and once he did so its dissolution was inevitable.

Therefore, the Court enters Judgment for the Mr. Kelley on Counts IX and X of the Counterclaim.

Counterclaim Count XI – Partition

The Partition is granted with respect to 738 N. Main Street, Brewer, Maine as set forth above.

Exhibits

It is ordered that the exhibits offered in this case be kept under seal. The exhibits contain the parties' dates of birth, social security numbers, tax identification numbers, and bank account numbers. The exhibits also include medical information relating to both parties.

The Clerk shall enter the following upon the docket:
  A. Judgment for the Plaintiff on Count I with respect to the 748 N. Main Street, Brewer, Maine property and Judgment for the Defendant on Count I with respect to the 46 Center Street, Brewer, Maine property. Partition is ordered with respect to 748 N. Main Street, Brewer, Maine property, the property is ordered sold, and after payment of the mortgage balance and the expense of sale, the parties shall split the proceeds equally;
  B. Count II – withdrawn by the Plaintiff;
  C. Count III – Judgment for the Plaintiff in the amount of $6,000.00;
  D. Count IV – Judgment for the Defendant;
  E. Counterclaim Counts I through X – Judgment for the Plaintiff/Crossclaim Defendant.
  F. The exhibits shall be kept under seal.

Dated: June 17, 2019

Ann M. Murray, Justice
Maine Superior Court

ORDER/JUDGMENT ENTERED IN THE
COURT DOCKET ON: 6-21-19

15